2020 IL App (2d) 170736WC-U
No. 2-17-0736WC
Order filed January 14, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed by Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| JAVIER MORENO, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 17-MR-64 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION *et al.* | ) | Honorable |
| | ) | David Akemann, |
| (Not Just Grass, Inc., Appellee). | ) | Judge, Presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Hoffman, Hudson and Harris concurred in the judgment.
Presiding Justice Holdridge specially concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The Commission erred as a matter of law by failing to employ a proper analysis in determining the type of risk to which the claimant was exposed.

¶ 2    The claimant, Javier Moreno, appeals the decision of the circuit court of Kane County, which confirmed the decision of the Illinois Workers' Compensation Commission (Commission), denying the claimant benefits because he failed to prove that he had sustained an injury arising out of and in the course of his employment.

¶ 3                                    I. Background

¶ 4      The following recitation of facts was taken from the evidence adduced at the arbitration

hearings and the record on appeal. The claimant, a healthy, 32-year-old with no prior back injuries

or pain, started employment with the respondent, Not Just Grass, Inc. (NJG), as a general laborer

in August 2014. The claimant worked 7 a.m. to 5:30 p.m. mowing lawns, trimming trees, lifting

rock and stone, and, occasionally, lifting and moving heavy machinery and trees.

¶ 5      On August 25, 2014, the claimant and his supervisor, Zak, lifted and transported five

flagstones, each weighing approximately 150 pounds. Shortly after completing this work, the

claimant felt "a real light [pain] in [his] lower back." The claimant did not immediately seek

medical care because he believed the pain would subside and he did not think it was "an

emergency." The claimant worked the remainder of the week and did not mention his low back

pain to management or his coworkers.

¶ 6      On August 29, 2014, the claimant was beaten in the head with a glass beer bottle and robbed

by unknown assailants at a local bar. According to the claimant, he lost consciousness for roughly

10 seconds after he was struck with a beer bottle, fell to the floor and was repeatedly kicked in the

head. Immediately following the attack, the claimant returned home, and his wife called the police.

According to police records, the attack was reported on August 30, 2014, at 3:10 a.m. The reporting

police officer characterized the claimant's "abrasions/scratches" to his head and right forearm as

"minor." At approximately 3:59 a.m., the claimant arrived at the emergency room where hospital

staff determined that the claimant was intoxicated and unable to consent to medical treatment.

Hospital records indicated a small laceration to the claimant's left inner cheek, swelling on the left

side of his face, pain to his face and mouth and scattered abrasions on his right elbow. Dr. Leilani

LaBianco's emergency room notes revealed that the claimant had complained of head pain and

right arm abrasions, but he did not voice groin or testicle pain, lumbar pain, hip or leg pain. The claimant did not report a loss of consciousness during the attack.

¶ 7    On September 2, 2014, the claimant informed the owner of NJG, Greg Voirin (Greg), that he was unable to work because of the August 29, 2014, altercation. When the claimant returned to work on September 4, 2014, the claimant mowed lawns and operated a weed trimmer and blower. The claimant denied that he had performed lighter duty work that day.

¶ 8    The claimant testified that on September 5, 2014, he felt a popping sensation in his lower back when he bent over to pick up a six-liter, 30-pound gas can. Although the claimant clarified that he had not actually lifted the can, he explained that he had been unable to straighten from the bent-over position for approximately 15 minutes because of pain. The claimant had not previously felt pain in his back or left testicle prior to this incident.

¶ 9    The claimant also testified that he notified Greg on September 5, 2014, while Zak and other coworkers were present, about the August 25, 2014, and September 5, 2014, incidents. Specifically, he informed Greg that he felt light pain in his back on August 25, 2014, when he lifted heavy flagstones. The claimant also told Greg about the gas can incident that occurred that day. The claimant further testified that he had requested Greg's assistance after he informed him of the incident on September 5, 2014. According to the claimant, Greg did not respond but paid the claimant before he left work. Thirty minutes following his conversation with Greg, the claimant testified that Zak informed him that Greg did not want him to return to work.

¶ 10    At the arbitration hearing on June 29, 2015, the claimant's attorney called Greg as an adverse witness. Greg testified to the following. Greg acknowledged that the claimant had worked on August 25, 2014, but he indicated that the claimant never informed him of a work accident occurring on that day. Instead, Greg became aware of the claimant's alleged August 25, 2014,

work accident at the arbitration hearing. The claimant informed Greg on September 5, 2014, of the accident that took place earlier that day. In fact, on September 5, 2014, Zak informed Greg that the claimant had reported an injury to his back at approximately 5:30 p.m. while lifting a gas can, a regular job activity.

¶ 11     On September 8, 2014, the claimant text messaged Greg that he was going to seek medical attention. Later that day, Greg text messaged the claimant the following: "Javier. If you start the claim[,] I can't have you work because you may get more hurt." Greg also informed the claimant that he could not pay him until he returned to work. That same day, the claimant sought treatment for left-sided back pain that radiated to the left groin. The claimant informed the medical staff that his symptoms had started two days earlier when he attempted to pick up a gas can. The claimant was initially diagnosed with an acute lumbar strain and instructed to take the day off.

¶ 12     On September 23, 2014, the claimant presented to Dr. Samir Sharma, a board-certified anesthesiologist. Dr. Sharma's notes stated the following:

> "This is a 32-year-old gentleman who sustained a work-related injury on September 5, 2014 while he was employed as a landscaper. He was doing a job including repetitive bending, twisting, moving locks [sic] that were over 100 pounds in weight, when he felt a slight strain which was aggravated when the patient was bending to lift a gas can to fill a lawnmower. The patient states at that time he bent forward and felt a strain in his left low back and aggravated it as he   was going to a standing position. The patient states that [it] happened around 10:30 a.m. on September 5, 2014, and it was reported to his supervisor at approximately 11:30 a.m. ***."

The claimant's history form stated that the "Pt bent over to pick up gas can. Pt states he couldn't get upright no more. Pt had a sudden sharp pain in low back. Pt states a week before accident Pt

lifted a heavy rock but didn't think nothing of it + cont. working." Dr. Sharma diagnosed the claimant with low back pain and left lumbar radiculopathy and instructed the claimant to remain off of work. Dr. Sharma prescribed medication, ordered an MRI and recommended physical therapy.

¶ 13    On September 24, 2014, the claimant started physical therapy. According to Dr. Sharma, the claimant's October 21, 2014, MRI showed a left lateral L4-L5 disc herniation that contributed to moderate lateral recess and foraminal stenosis. Based on the MRI results, Dr. Sharma ordered four additional weeks of physical therapy and advised the claimant that he could return to work with restrictions. Dr. Sharma later opined that the claimant's symptoms were secondary to the September 5, 2014, work-related injury.

¶ 14    On September 26, 2014, the claimant filed his initial application for adjustment of claim pursuant to the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2014)) seeking compensation for a back injury he sustained when he bent over to pick up a gas can on September 5, 2014.

¶ 15    On January 29, 2015, the claimant underwent a section 12 medical examination, at NJG's request, by Dr. Matthew Ross, a neurosurgeon. Dr. Ross was of the opinion that there was "a causal relationship between Mr. Moreno's work activities and his left sciatic pain and need for additional medical treatment." In particular, Dr. Ross stated the following:

> "Mr. Moreno has low back and left sciatic pain following his work incident on September 5, 2014. By history, Mr. Moreno started becoming symptomatic a week or 2 earlier with lifting heavy rocks at work. There was no actual accident or specific injury that occurred on September 5, 2014. Mr. Moreno simply bent forward to pick up the can of gasoline and experienced back pain. He specifically denies making any

effort to actually lift the gasoline can. Although Mr. Moreno did not have an accident or over stress (sic) injury of his back on the date of major pain flare-up, his history of low level back pain following lifting rocks suggests that his injury actually occurred earlier. The L4-5 disk may have been initially injured lifting the rocks. The bending forward to lift the gas can may literally have been the straw that broke the camel's back. It is not uncommon to see disc herniation in evolution begin as back pain, and then erupt as sciatic pain following a trivial event."

Additionally, Dr. Ross noted that "the ER physician specifically did not notice any evidence of trauma to the neck or back" on August 30, 2014.

¶ 16　On February 13, 2015, Dr. Geoffrey Dixon, an orthopedic surgeon, reviewed the claimant's September 24, 2014, MRI and noted a left L4-L5 disc herniation that extended into the lateral recess and foramen. Dr. Dixon recommended a left L4-L5 micro-lumbar decompression and discectomy, prescribed pain medication and advised the claimant to remain off of work, pending surgery approval. The claimant underwent a second MRI on March 18, 2015, that revealed a far-left lateral herniated disc at L4-L5 that involved the left neural foramen.

¶ 17　On April 1, 2015, the claimant filed his second application for adjustment of claim for the injury he sustained while moving and lifting 150-pound flagstones on August 25, 2014.

¶ 18　On May 20, 2015, claimant filed a petition for an expedited hearing on both claims under section 19(b) of the Act (820 ILCS 305/19(b) (West 2014)). The claimant's claims were consolidated for hearing before the arbitrator on June 29, 2015, and July 10, 2015, and the arbitrator issued separate decisions on February 22, 2016. Specifically, the arbitrator determined that the claimant had not sustained an injury that arose out of and in the course of employment with NJG on August 25, 2014, and that the claimant had failed to provide timely notice. The

arbitrator also found that the claimant's injury from the September 5, 2014, accident was not due to a risk distinctly associated with his employment. The arbitrator applied a neutral risk analysis, finding that the evidence was deficient to establish that the claimant was exposed to a greater risk, both qualitatively and quantitatively, than the general public. The arbitrator concluded that the evidence was insufficient to establish that the injury arose out of and in the course of his employment. The claimant filed petitions for review before the Commission.

¶ 19    On December 22, 2016, the Commission issued a unanimous decision adopting and affirming the arbitrator's decision. Specifically, the Commission found that "the Arbitrator properly applied the neutral risk analysis and found the evidence to establish accident deficient under either the qualitative or quantitative analysis" pertaining to the September 5, 2014, accident. On January 13, 2017, the claimant filed a timely notice of intent to file for judicial review in the circuit court of Kane County.

¶ 20    On August 25, 2017, the circuit court entered an order confirming the Commission's decision. The claimant filed a timely notice of appeal.

¶ 21                                    II. Analysis

¶ 22    On appeal, the claimant challenges only the Commission's denial of compensation for his September 5, 2014, accident. Specifically, the claimant argues that his injury involved a risk incidental to his employment as a general laborer. As such, the Commission employed an improper risk analysis because it was unnecessary for the Commission to conduct a neutral-risk analysis. We agree with the claimant that the Commission employed an improper analysis in categorizing the risk of harm, thus, remand to the Commission is necessary for a proper determination as to whether a causal connection exists between the claimant's employment and his accidental injury.

¶ 23　　To begin, we will address our standard of review. The standard of review, which determines the level of deference to be afforded the Commission's decision, depends on whether the issue presented on appeal is one of fact or law. *Johnson v. Illinois Workers' Comp. Comm'n,* 2011 IL App (2d) 100418WC, ¶ 17. Our review of the Commission's factual findings is limited to determining whether such findings are against the manifest weight of the evidence. *Johnson,* 2011 IL App (2d) 100418WC, ¶ 17. A finding of fact is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Beelman Trucking v. Illinois Workers' Compensation Comm'n*, 233 Ill.2d 364, 370 (2009). "Commission rulings on questions of law are reviewed *de novo*." *Johnson,* 2011 IL App (2d) 100418WC, ¶ 17. "We also apply a *de novo* standard of review when the facts essential to our analysis are undisputed and susceptible to but a single inference, and our review only involves an application of the law to those undisputed facts." *Id.* ¶ 17.

¶ 24　　Here, in accordance with the above-stated principles, the propriety of the Commission's decision presents us with a determination as to whether the Commission applied a proper analysis in categorizing the risk of harm. Specifically, the claimant asserts that "the Commission and the circuit court erred in the application of law to the facts at hand." With respect to this narrow issue, we agree with claimant that the *de novo* standard of review applies. Again, claimant does not dispute the accuracy of the Commission's factual findings. Rather, he argues that the Commission employed an improper legal standard in determining the type of risk of harm to which he was exposed. This presents an issue of law for which our standard of review is *de novo*.

¶ 25　　We now turn to the merits of the issue raised on appeal. To be compensable under the Act, a claimant must prove, by a preponderance of the evidence, that the accidental injury was one "arising out of and in the course of the employment." 820 ILCS 305/2 (West 2014). An injury

arises out of employment when "the injury had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Parro v. Industrial Comm'n,* 167 Ill. 2d 385, 393 (1995). To determine whether a claimant's injury arose out of her employment, we must first determine the type of risk to which he was exposed. *Baldwin v. Illinois Workers' Comp. Comm'n*, 409 Ill. App. 3d 472, 478 (2011). There are three types of risks to which employees may be exposed: (1) risks that are distinctly associated with employment; (2) risks that are personal to the employee, such as idiopathic falls; and (3) neutral risks that do not have any particular employment or personal characteristics. *Potenzo v. Illinois Workers' Comp. Comm'n,* 378 Ill. App. 3d 113, 116 (2007).

¶ 26     "[I]f the injury results from a hazard to which the employee would have been equally exposed apart from the employment, or a risk personal to the employee, it is not compensable." *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 59 (1989). Injuries resulting from the second category of risks, such as risks personal to the employee, do not arise out of the employment and, for that reason, are not compensable under the Act. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 45 (1987). Injuries resulting from neutral risks are deemed to arise out of the employment only where the employee was exposed to the risk to a greater degree than the general public, either qualitatively or quantitatively, by virtue of his employment. *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1014 (2011).

¶ 27     As part of its decision, the Commission categorized the risk of injury to which claimant was exposed as employment, neutral, or personal when he bent over or forward with the intention of lifting a gas can. In categorizing claimant's risk, however, the Commission utilized an improper analysis that resulted in the automatic exclusion of his risk of injury from the employment-risk

category without reference to his employment or his specific work duties. As a result, the Commission failed to determine the connection, or lack thereof, between the claimant's injury and his employment duties. This was error.

¶ 28    The arbitrator concluded that claimant was not exposed to an employment-related risk because "the act of bending over or bending forward is a movement consistent with normal daily activity." The Commission affirmed and adopted the arbitrator's decision and additionally cited the following proposition from *Adcock:*

> "The Commission should not award benefits for injuries caused by everyday activities like walking, bending, or turning, even if an employee was ordered or instructed to perform those activities as part of his job duties, unless the employee's job required him to perform those activities more frequently than members of the general public or in a manner that increased the risk. In other words, a 'neutral risk' analysis should govern such claims." *Adcock v. Illinois Workers' Comp. Comm'n*, 2015 IL App (2d) 130884WC, ¶ 39; see also *Noonan v. Illinois Workers' Compensation Comm'n*, 2016 IL App (1st) 152300WC, ¶ 41 (Holdridge, P.J., specially concurring).

¶ 29    However, in *McAllister v. Illinois Workers' Comp. Comm'n*, 2019 IL App (1st) 162747WC, ¶ 38, a majority of this court rejected the neutral-risk analysis utilized in *Adcock*. We found that *Adcock's* analysis was at odds with other decisions of this court, which did "not automatically exclude from the definition of an employment-related risk activities that might involve common bodily movements or *** 'everyday activities.' " *McAllister,* 2019 IL App (1st) 162747WC, ¶ 38. We held that when presented with employment-risk and neutral-risk alternatives, the trier of fact should first consider whether the risk at issue had employment-related

characteristics. *Id.* ¶ 68. Additionally, in *McAllister*, 2019 IL App (1st) 162747WC, ¶ 73, we stated the following:

> "[A]n 'arising out of' determination requires an analysis of the claimant's employment and the work duties he or she was required or expected to perform. Only after it is determined that a risk is not employment-related should the Commission consider and apply a neutral-risk analysis."

¶ 30    Here, both the arbitration and Commission decisions reflect adherence to the *Adcock* analysis and application of the neutral-risk definition that was rejected in *McAllister*. In other words, the Commission automatically excluded the claimant's risk of injury from the employment-risk category because the activity resulting in injury involved a common bodily movement. The Commission's decision reflects that, because it applied an *Adcock* analysis, it did not consider the nature of the claimant's employment and his required work duties before finding that the claimant's injury stemmed from a neutral risk.

¶ 31    Given these circumstances, we must remand to the Commission so that it may apply the proper risk analysis, make necessary findings of facts and draw reasonable inferences from the evidence to determine whether the claimant's injury arose out of his employment. "The resolution of whether there is a causal connection between the claimant's injuries and the employment is *uniquely* within the province of the *** Commission." (Emphasis added.) *Domagalski v. Indus. Comm'n*, 97 Ill. 2d 228, 236 (1983). It is also within the province of the Commission "to draw reasonable inferences and conclusions from competent evidence in the record." *Pazara v. Industrial Comm'n*, 81 Ill. 2d 76, 83 (1980); see also *Schoonover v. Industrial Comm'n*, 86 Ill. 2d 321, 326 (1981) ("The Commission can draw reasonable inferences from the evidence and a court will not disregard them simply because the court might have drawn other inferences."); *Peoria*

*Motors, Inc. v. Indus. Comm'n*, 92 Ill. 2d 260, 264-65 (1982) (It is the Commission's responsibility "to find facts and draw the inferences necessary to enable it to say that a particular accident did or did not arise out of and in the course of work").

¶ 32    Further, "[i]t is well settled that if undisputed facts upon any issue permit more than one reasonable inference, the determination of such issues presents a question of fact, and the conclusion of the Commission will not be disturbed on review unless it is contrary to the manifest weight of the evidence." *Caterpillar Tractor Co.*, 129 Ill. 2d at 60; see also *Greene v. Industrial Comm'n*, 87 Ill. 2d 1, 5 (1981) (rejecting a suggestion that the arising-out-of question could be reconsidered without deference to the Commission where there were multiple reasonable inferences to be drawn from the evidence regarding whether the employee's death "resulted from a purely personal risk, from a risk common to the public at large, or from a risk incidental to the *** employment").

¶ 33    Here, although the material facts may not be in dispute, conflicting inferences may be drawn from those undisputed facts regarding the claimant's risk of injury. Under such circumstances, the Commission's decision is entitled to great deference on review. The problem in this case, however, is that the Commission did not discharge its responsibility to draw reasonable inferences when categorizing the claimant's risk of injury. Instead, as stated, it determined that the neutral-risk category automatically applied, and the employment-risk category was automatically precluded, because the claimant was performing an activity that involved a common bodily movement at the time of injury. Accordingly, we cannot yet review the Commission's decision to determine whether it was against the manifest weight of the evidence.

¶ 34    Based on the foregoing, we reverse the circuit court's judgment confirming the Commission's decision, vacate the Commission's decision and remand this cause to the

Commission with directions to employ the proper risk-analysis set forth in *McAllister*. The Commission's resultant determination on subsequent review—whether claimant's act of bending over was or was not distinctly related to his employment—will be accorded significant deference under the manifest-weight-of-the-evidence standard. Accordingly, we express no opinion regarding this factual matter.

¶ 35                                    III. Conclusion

¶ 36     We reverse the circuit court's judgment confirming the Commission's decision, vacate the Commission's decision and remand this cause to the Commission with directions to employ the proper risk-analysis set forth in *McAllister,* 2019 IL App (1st) 162747WC.


¶ 37     Circuit court reversed; Commission's decision vacated; remanded to the Commission with directions.

¶ 38     PRESIDING JUSTICE HOLDRIDGE, specially concurring.

¶ 39     I join the majority's judgment because I agree that *McAllister v. Illinois Workers' Compensation Comm'n*, 2019 IL App (1st) 162747WC, which is currently the law, governs in this case. However, for the reasons I discussed at length in my special concurrence in *McAllister*, I believe that *McAllister* misconstrued the holding and analysis of our prior decision in *Adcock v. Illinois Workers' Comp. Comm'n*, 2015 IL App (2d) 130884WC, erroneously rejected *Adcock*, and applied an improper and unworkable analysis. In my view, the majority in this case repeats the errors of *McAllister*. *McAllister* is currently on review before our supreme court. I am hopeful that our supreme court will reverse *McAllister* and reaffirm the analysis we employed in *Adcock*, which I believe to be both more analytically sound and more workable than the analysis prescribed by *McAllister*.